## Illinois Life Insurance Company, Appellant, v. Joseph Beifeld, Appellee.

### Gen. No. 18,765.

1.  CONTRACTS, § 52*—*when memorandum is a complete contract and not an agreement for execution of formal contract.* A memorandum signed by the parties relating to the leasing of a portion of certain premises and the assignment of leases as to other portions, *held* to constitute a complete contract and not a mere skeleton or outline for the preparation of contracts to be thereafter agreed upon and executed.

2.  CONTRACTS, § 173*—*when contract is incomplete.* Where it is apparent from the language of a contract to convey that some of the terms and conditions which are to be inserted in the instrument of conveyance are still unsettled and open to further negotiations, then the agreement to convey is incomplete because there is no agreement in fact.

3.  CONTRACTS, § 8*—*when not void for uncertainty.* A contract to lease a portion of premises for a term of years and to make an assignment of existing leases on other portions, *held* not void for uncertainty for the reason that it does not provide for all possible contingencies, where it expresses the agreement of the parties in such form as to leave little room for doubt as to what was intended and what matters were in fact agreed upon.

4.  CONTRACTS, § 8*—*when contract for assignment of leases or subleases not uncertain.* A contract to lease a portion of certain premises and to make an assignment of leases or subleases to other premises as soon as the same can be conveniently prepared, *held* not subject to objection that it is uncertain whether assignments of existing leases or subleases should be prepared, where the whole term of the existing leases was to be conveyed and subleases if executed would amount in legal effect to assignments.

5.  CONTRACTS, § 12*—*when not void for want of mutuality.* A contract whereby one party "agrees to take" a lease of certain property and assignments or subleases of other property as soon as the same can be conveniently prepared, at a stipulated rental, and also agrees to deposit securities concurrently with the execution and delivery of the lease, *held* to clearly import a present agreement by such party to accept an offer made by the other party to execute and deliver the lease and assignments, since the word "take" may be construed to mean "accept" so as to give effect to the intention of the parties.

*See Illinois Notes Digest, Vols. XI to XV, same topic and section number.

Illinois Life Ins. Co. v. Beifeld, 184 Ill. App. 582.

6. CORPORATIONS, § 420*—*power of life insurance corporation to lease real estate.* The power given a life insurance corporation under Hurd's St. 1911, ch. 73, ¶ 182, J. & A. ¶ 6460, "to sell and dispose of" real estate lawfully acquired but no longer necessary for the transaction of its business, does not preclude it from making a lease of such property for a term of ninety-seven years. The words "dispose of" may be construed to mean "to alienate" or to convey by proper instruments of conveyance.

7. CORPORATIONS, § 404*—*when life insurance corporation may sell property no longer required for its business.* Hurd's St. 1911, ch. 73, ¶ 182, J. & A. ¶ 6460, does not require a life insurance corporation having property which is no longer required for the transaction of its business to immediately sell and convey the same. Under such statute it may hold such property a reasonable time in order that the same may be sold to advantage.

8. CORPORATIONS, § 344*—*who may attack contract made by corporation because it is ultra vires.* Where an *ultra vires* contract is one which the corporation was not under any circumstances authorized to perform, it is void and may be attacked anywhere by any one. But where the validity of the contract depends upon the question whether the corporation has abused, or unjustifiably used, a power which it had the right to exercise, if exercised in good faith, then only the State can attack it.

Appeal from the Superior Court of Cook county; the Hon. CLARENCE N. GOODWIN, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1912. Reversed and remanded with directions. Opinion filed January 22, 1914. Rehearing denied February 9, 1914.

**Statement by the Court.** This appeal brings up for review a decision of the Superior Court, sustaining a demurrer to a declaration in *assumpsit.*

The declaration alleges, in substance, that the plaintiff is a corporation, organized under the laws of Illinois for the purpose of carrying on the business of life insurance; that on April 17, 1906, it was the owner and in possession, through its tenants, of certain property at the corner of LaSalle and Madison streets, in Chicago; that a part of said property, hereinafter called the Oriental property, was owned by the plaintiff in fee, and the remainder was held under ninety-nine years' leases, which, with one exception, began

*See Illinois Notes Digest, Vols. XI to XV, same topic and section number.

May 1, 1905, and will expire April 30, 2004; that one parcel, called the Jennings property, was held under a lease expiring April 30, 1987, and as to that parcel the plaintiff had entered into a contract with the owner of the fee thereof for the execution of a new lease of the same for a term ending April 30, 2004, "so as to make all of the leasehold estates on the entire premises expire at the same time, in order that a building or buildings covering the entire premises might be erected thereon;" that "all of the aforesaid property had been acquired by the plaintiff in the manner above stated for the purpose of carrying on the business for which it was corporated;" that on April 17, 1906, the defendant desired to acquire a lease of the property owned by the plaintiff in fee for a term of years expiring April 30, 2004, and assignments or subleases of the other property covering the same period "and thereupon executed with the plaintiff a written contract as follows:

### MEMORANDUM.

1.   This memorandum relates to the several holdings of property of the Illinois Life Insurance Company, situated at the Northwest corner of Madison and LaSalle streets, Chicago, extending 178 feet on LaSalle street by 162 feet on Madison street, and comprising (1) Oriental or Coleman property, fee, (2) Jared Bassett leasehold, (3) University of Chicago leasehold, (4) John D. Jennings and wife leasehold; (5) Lambert Tree leasehold, and (6) Richard High Carleton and Everett H. Noyes, trustees, leasehold.

2.   Mr. Beifeld agrees to take lease of Oriental property and assignments or sub-leases of other property (as soon as the same can be conveniently prepared), beginning October 1, 1906, subject to existing leases, and running for 97 years and 7 months.   Annual ground rental to be $50,000 for first year, $56,000 for seven months, October 1, 1907, to May 1, 1908; $96,000 per year from May 1, 1908, to May 1, 1910; $98,000 per year from May 1, 1910, to May 1, 1915; and $100,000 a year from May 1, 1915, to the end of the lease.   Rent payable in twelve equal installments,

monthly, in advance. Lessee to pay all taxes, assessments, charges, etc., levied or assessed for the year 1907, and thereafter during the term of said lease.

3. Lessee to build and complete by May 1, 1908, unless prevented by existing leases, and in any event not later than May 1, 1909, a modern fireproof building, built according to the city ordinances, not less than twelve stories high, and costing not less than $2,000,000. Architect's fees, ground rental for first year, and cost of cancellation of present leases of tenants in possession, to be considered as part of cost of said building. Architect to be Holabird & Roche, or some other architect approved by lessor. Plans and specifications to be submitted to and approved by lessor.

4. Concurrently with the execution and delivery of the lease of the Oriental property, as aforesaid, and the assignment of the other leases as above provided, Mr. Beifeld to deposit with the First Trust & Savings Bank, or such other trustee as may be mutually agreed upon, as security for the performance of the covenants and agreements in said leases and assignments, $530,000 of White City stock; and when Mr. Beifeld takes possession of the properties so leased and assigned, but in no event later than October 1, 1906, he shall also deposit with said trustee, as further security for the performance of the covenants and agreements in said leases and assignments, $500,000 of acceptable securities at the bid cash market value, including not to exceed $250,000 of White City bonds at par. The $530,000 of White City stock to be held until the building is completed, furnished and equipped and the ground floor leases thereof assigned, and the securities now held by the University of Chicago and Bassett and Tree are released,—the other $500,000 of securities to be released in sums of $5,000, or multiples thereof, as the amounts so released have first been actually expended in the construction of the building, as shown by architect's certificates.

5. When not less than $1,000,000 has been expended in the construction of the building, and it has so far advanced that $1,000,000 will be sufficient to complete it, including all unpaid bills, the Illinois Life In-

surance Company agrees to buy, at par, the entire issue of $1,000,000 of 5 per cent. gold bonds (interest payable quarterly; bonds to be personally endorsed by Mr. Beifeld and of form acceptable to the purchaser) to be secured by a first mortgage on leasehold and building, furniture, fixtures and equipment, and assignment of ground floor leases; said bonds being payable, $50,000, January 1, 1913, and thereafter, serially, not less than $50,000 annually and in increasing amounts until 1930, when the last bond shall be due and payable. Said bonds are also to be further secured by insurance procured at expense of lessee on the building for an amount not exceeding $1,000,000 as may be required by the purchaser of said bonds, said insurance to be payable to the trustee, in addition to other insurance required by present leases; also by insurance on furniture and fixtures, all equipment not part of real estate, and rents of first floor to an amount equal to 80 per cent. of the value of said rents; such policies to be deposited with the trustee. Said bonds are to be purchased and paid for from time to time as satisfactory showing is made that the cost of completing the building, including unpaid bills, is within the amount of bonds still unpaid for.

6. Assignments or sub-leases, above referred to, to be subject to, and conform in all respects with, original leases now existing upon said land. Said leases to be reassigned to Illinois Life Insurance Company as additional security for the covenants made by the lessee in contract of assignment and in lease on Oriental property,—such reassignment to be made subject to the rights of the mortgagee.

7. Illinois Life Insurance Company agrees to secure Mr. Beifeld that it will purchase the above $1,000,000 of bonds at par.

8. Forfeiture of one lease to forfeit all.

9. Lessor to use every possible effort in assisting Mr. Beifeld to secure the consent of University of Chicago to the erection of a hotel building.

10. In case lessee desires any part of the premises covered by the various leases hereinbefore referred to at a time earlier than October 1, 1906, he shall be permitted to have the same, subject to any and all ex-

isting leases thereon, upon payment to the Illinois Life
Insurance Company of the same rental paid by the
tenant in possession up to October 1, 1906.

Witness the execution hereof by the undersigned,
this sixteenth day of April, A. D. 1906.

ILLINOIS LIFE INSURANCE COMPANY,
By James W. Stevens,
President.

(SEAL)
Attest:
Oswald J. Arnold,
Secretary.

JOSEPH BEIFELD."

The declaration then avers that after the execution
of said contract the plaintiff "began and duly prose-
cuted the preparation of all things required of it un-
der said contract," and was ready and willing and of-
fered to fully perform the same on its part, and to
prepare and execute all documents and do all things
required of it by the terms of the contract; but that
the defendant refused to perform the contract, and on
June 25, 1906, notified the plaintiff that he would
neither perform the contract nor accept performance
thereof on the part of the plaintiff, "no matter in
what form the various contracts, papers and instru-
ments referred to in said contract should be executed
or caused to be executed by said plaintiff." It is then
averred that by reason of such refusal of the defend-
ant the plaintiff was put to great cost and expense and
lost divers large gains and profits, etc., to the damage
of the plaintiff of $200,000.

After a demurrer to the declaration had been filed
and overruled and nearly a year's time had been con-
sumed in filing pleas and additional pleas, demurrers
thereto, replications and rejoinders, a stipulation was
filed wherein it was agreed that "for the purpose of
permitting the defendant to take and have all lawful
advantage of the judgment of the court on the ques-
tion whether the declaration states any cause of action
against the defendant which would sustain a verdict

and judgment in favor of the plaintiff," all of the
pleadings subsequent to the declaration should be
withdrawn and that a general demurrer to the declar-
ation should be filed "limited to the question of
whether the declaration states any cause of action
which would sustain a verdict and judgment in favor
of the plaintiff, but shall not present the question of
*ultra vires,* upon which the court has heretofore ruled
in favor of the plaintiff." An order was entered in
accordance with the stipulation, the general demurrer
was filed and, after argument of counsel, was sus-
tained. The plaintiff elected to stand by its declara-
tion and a judgment for costs was thereupon entered
against it, from which the plaintiff appeals.

TENNEY, COFFEEN, HARDING & SHERMAN, for appel-
lant; HORACE KENT TENNEY and HARRY A. PARKIN, of
counsel.

FELSENTHAL & BECKWITH, for appellee; ELI B. FEL-
SENTHAL and WALTER J. SPENGLER, of counsel.

MR. PRESIDING JUSTICE FITCH delivered the opinion
of the court.

The only question raised upon this appeal is wheth-
er the declaration states a good cause of action. On
behalf of appellee, it is contended (1) that the instru-
ment set forth in the declaration is not a contract, but
is a mere memorandum, intended to serve as a skele-
ton or outline for the preparation of contracts to be
thereafter agreed upon and executed; (2) that if the
instrument can be considered as a contract, it is void for
uncertainty; (3) that, as so considered, it is void for
want of mutuality; (4) that, in any view, it is *ultra
vires,* and void for that reason.

FIRST. As to the first of these contentions, the ar-
gument is, as we understand it, that because the mem-
orandum, though signed by the parties, shows upon
its face that a formal "contract of leasing" and for-

mal assignments or subleases were to be subsequently prepared, and because it appears from the memorandum that but few of the usual covenants and conditions of ordinary leases are mentioned as having been agreed on, therefore it must be held that the memorandum was intended to be only an agreement to enter into another agreement, the precise terms and conditions of which were still undetermined at the time the memorandum was signed. We are unable to take this view of the matter. The memorandum shows that all the essential provisions of a valid lease and valid assignments had been in fact agreed on, and appellee therein "agrees to take" a lease containing those provisions "as soon as the same can be conveniently prepared." A lease for a term of years is a chattel real, and conveys an interest in the land demised. *People v. Shedd*, 241 Ill. 155, 165. So far as we are advised, it has never been held that a contract which provides for the conveyance of real estate by a warranty deed, or other specified instrument of conveyance, is an incomplete contract merely because it provides that such deed or instrument is to be subsequently prepared. Of course, if it is apparent from the language of the contract that some of the terms and conditions which are to be inserted in the instrument of conveyance are still unsettled and open for further negotiation, then the agreement to convey is incomplete because in such case there is no agreement in fact. But we do not think there is any language in the document under consideration that can be so construed. It speaks of appellant as the "lessor" and of appellee as the "lessee." It describes the property which is to be leased, the duration of the term, the rental, and the time and manner in which the rent shall be payable. It provides that the lessee shall pay "all taxes, assessments, charges, etc., levied or assessed for the year 1907 and thereafter during the term of said lease." The only "charges, etc.," which can be "levied or assessed" against real estate are taxes and special assessments.

It provides that the lessee shall build and complete within a fixed time, a building of a specified type, height and cost, and provides that architect's fees and certain other expenses of building shall be included in the cost. It provides further that "concurrently with the execution and delivery of the lease," appellee shall make certain deposits with a specified bank, "or such other trustee as may be mutually agreed upon," as security for the performance of the covenants of the lessee. In this clause a way was left for a subsequent agreement as to some other trustee than the one specifically mentioned, but that fact does not make the contract incomplete, for the clear intention is that in the absence of any such subsequent agreement the trustee specified should act. Throughout the memorandum, the word "agrees" is used, indicating a present and not a future agreement. It is inconceivable that the parties would go to the trouble of preparing a document like this, and cause it to be formally signed, on the part of the appellant corporation, by its president and secretary, and attested with the corporate seal, and also to be signed in person by appellee, if they intended it to be a mere memorandum for future reference only, not binding upon either party except in the event of a subsequent further agreement. We think the memorandum thus prepared and signed must be construed as a complete agreement to convey a specified interest in the property described upon the terms therein set forth, as soon as a formal instrument to that effect could be conveniently prepared for the signature of the parties.

Second. As to the second contention above stated, what we have already said applies with equal force to the argument made upon this point. Appellee's counsel have picked out sentences here and there, which they claim are not sufficiently explicit to enable a lawyer to so prepare a lease as to definitely provide for all contingencies that might be suggested. It may be conceded that the memorandum does not provide in

express terms for all possible contingencies, but that fact does not render the contract void for uncertainty. The document expresses the agreement of the parties in such form as to leave little room for doubt as to what was intended and what matters were in fact agreed upon; and that is enough to overcome the objection of uncertainty. The objection that it is uncertain whether assignments of existing leases, or subleases, should be prepared is immaterial, for as the whole term of existing leases was to be conveyed, subleases, if executed, would amount to the same thing in legal effect as assignments. *Lyon v. Moore,* 259 Ill. 23. It would unduly extend the limits of this opinion to take up and discuss each of the sentences objected to on this ground, and it will suffice to say that after due consideration of the arguments advanced we think the objections are not well taken.

THIRD. It is argued at great length, and with much force, that an agreement by one party to "take" a lease does not, as a matter of law, impose any obligation on the other party to "give" such a lease. It is conceded that the courts may construe an obligation from the words used by the parties in a contract, but it is insisted that the language used in the memorandum in question is too plain for construction, and that to construe an obligation upon appellant to give a lease from words which only require appellee to take one, would be to create an obligation by implication. Some words are often used in a double sense, and others have more than one meaning. In order to arrive at the meaning of words used in a contract, the whole contract must be considered; and if, when so considered, the words employed have a signification other and different from the meaning conveyed by the same words when standing alone, it is the duty of the court to interpret the words used so as to give effect to the intention of the parties, if such intention clearly appears from all the language of the contract. In the memorandum in question, appellee "agrees to take

lease of Oriental property and assignments or sub-leases of other property (as soon as the same can be conveniently prepared), beginning' October 1, 1906, subject to existing leases, and running for 97 years and 7 months,'' at a stipulated rental, and he also agrees to deposit a large amount of securities ''con-currently with the execution and delivery'' of the lease. One meaning of the word ''take'' is ''to accept as something offered; to receive; not to refuse or re-ject.'' (Webster's Dict.) Giving the word ''take'' this meaning, and reading the phrase in which it is used in connection with the other clauses above quoted, the contract clearly imports a present agreement by Bei-feld to *accept an offer made by appellant to execute and deliver to him a lease* of the Oriental property and assignments or subleases of the other property, as soon as the same can be conveniently prepared. This interpretation of the words used does not *create* an obligation by implication, but construes the contract so as to give effect to the intention of the parties, as shown by the language employed. It is impossible to read the memorandum in question without being im-pressed with the view that the parties thereby intend-ed to state, not only in substance but in detail, the terms and conditions of a lease which they agreed should be at once prepared and executed by appellant, and accepted by appellee. In principle, the memo-randum in this case is like the contracts construed in *Minnesota Lumber Co. v. Whitebreast Coal Co.,* 160 Ill. 85; *Torrence v. Shedd,* 156 Ill. 194, and *Sanitary Dist. of Chicago v. McMahon & Montgomery Co.,* 110 Ill. App. 510. We are of the opinion that the contract imposed mutual obligations, in consideration of the mutual promises therein contained.

FOURTH. A more difficult question, in our opinion, is presented by the contention that the contract was *ultra vires.* No claim is made in this court that the term of the lease contracted for extends beyond the corporate life of appellant. Whether such is or is not

the fact does not appear; and whether that fact, if true, would affect the question here presented is not discussed by counsel. The contention as made here is that the making of a lease, for ninety-seven years, of property which a life insurance corporation has lawfully acquired but which becomes unnecessary for the transaction of its business, is beyond the power of such a corporation to make, because of the language of the statute permitting such corporation to own only "so much real and personal estate as shall be necessary for the transaction of its business, and to sell and dispose of the same when deemed necessary." (Hurd's St. 1911, ch. 73, ¶ 182, J. & A. ¶ 6460.)

It is alleged in the declaration that all the property mentioned in the memorandum contract had been acquired by appellant "for the purpose of carrying on the business for which it was incorporated." This allegation is admitted by the demurrer. Having lawfully acquired such property, if it may be held, as we think it may, that the execution of the memorandum contract is *prima facie* evidence of the fact that the property in question was deemed to be no longer necessary for the transaction of its business, then the only question as to the power of the corporation to make such a contract is whether the power given by the statute to "sell and dispose of" such real estate precludes appellant from making a lease of the same for ninety-seven years and seven months.

It is contended by appellee's counsel that the words "dispose of," as used in the statute, must be construed to apply only to transactions that are in their nature equivalent to sales; to which contention appellant's counsel reply that to give those words the same meaning as the word "sell" would be to read the statute "to sell and to sell," thereby giving to the words "dispose of" the effect of mere repetition. Appellant's counsel contend that the making of such a lease as the contract provides for does, in effect, "dispose of" the property. We think that neither of these con-

tentions is entirely sound. The phrase "to dispose of" has two meanings; one is "to exercise the power of control over;" the other is "to exercise *finally* one's power of control over; to alienate." (Webster's Dict.) Clearly, the latter of these meanings is the one in which the phrase is used in the statute. As thus construed, the statute gave to appellant the right to sell and *alienate* the property in question; or, in other words, to sell and convey the same by proper instruments of conveyance. But the statute does not require a corporation having property which is no longer required for the transaction of its business to *immediately* sell and convey the same. It may, undoubtedly, hold such property a reasonable time, in order that the same may be sold to advantage. Under some statutes relating to corporations, a time limit of five years is fixed. As to life insurance companies, by an act passed *after* this contract was entered into, it was provided that such property shall be "sold and disposed of" within five years after the same shall have ceased to be necessary for the accommodation of the business of the corporation, unless a certificate is obtained from the insurance superintendent extending the time. Hurd's Stat. 1909, p. 1312. (J. & A. ¶ 6507.) It is unnecessary to decide whether these statutes must be considered in determining the rights and powers of appellant. Assuming that to be true, it would be absurd to say that during the five years' limitation, if an insurance company should be unable to find a buyer for such property, it must suffer its property to remain vacant and unoccupied, bringing no return and entailing constant expense in carrying the same. The fact that property is leased does not *prevent* a sale of it. On the contrary, it is a matter of common knowledge that property which is advantageously leased is frequently more salable because of that fact. So the mere making of a lease for ninety-seven years does not prevent a sale of the property. Such a lease might, and probably would, in many cases, give a value

to the fee which it would not otherwise possess.    If such a lease were to be made as a part of a plan adopted by a corporation for the purpose of effecting a more advantageous sale of its unnecessary real estate, there would seem to be no question of its right and power under the statute to do so.    This being true, it follows that whether appellant had, or had not, such a plan and purpose in view, when it made the contract for such a lease, is not a question of power but a question of its intention, or good faith, in exercising a power which it had the right under some circumstances, to exercise. Where an alleged *ultra vires* contract is one which the corporation was not, under any circumstances, authorized to perform, it is void and may be attacked anywhere, by any one. *National Home Building & Loan Ass'n v. Home Sav. Bank,* 181 Ill. 35.    But where the validity of the contract depends upon the question whether the corporation has abused, or unjustifiably used, a power which it had the right to exercise, if exercised in good faith, then only the State can attack it.    *Rector v. Hartford Deposit Co.,* 190 Ill. 380.    In any view, however, the facts stated in the declaration do not raise the presumption that appellant intended to continue to hold its real estate in violation of the statute.    We therefore conclude that the objection of *ultra vires* cannot prevail in this case.

For the reasons indicated, we think the demurrer to the declaration should have been overruled.    The judgment of the Superior Court will, therefore, be reversed and remanded with directions to that court to overrule the demurrer.

*Reversed and remanded with directions.*